UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

ANGELA PINNELL,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )          Case No. 4:16 CV 691 RWS
                                   )
CITY OF GERALD, MO, et al.,        )
                                   )
          Defendant.               )

## MEMORANDUM AND ORDER

Defendants, the City of Gerald (the "City") and its current and former officers (Steve Goodwin, Stephen Grgurich, Ruth Haase, Annette Justus, Jason Risse, Hillary Ward, Keith Wehmeyer, Tom Wright), move for summary judgment against Plaintiff Angela Pinnell's First Amendment retaliation and conspiracy claims. Pinnell claims that she was terminated by the City's police department because she spoke out about grant money the police department wrongfully paid. The City defends its termination of Pinnell on the grounds that (1) Pinnell did not speak as a citizen on a matter of public concern, (2) the City did not have a retaliatory motive in firing her, and (3) its officers reached no agreement to deprive her of her First Amendment rights.

I find that (1) Pinnell's speech was protected because in several instances she spoke as a citizen on a matter of public concern. I also find that Pinnell has

1

presented evidence sufficient to argue (2) that the city had a retaliatory motive in firing her and (3) that its officers reached an agreement to deprive her of her First Amendment Rights. As a result, I will deny defendants' motion for summary judgment.

## BACKGROUND

Pinnell served as a police officer for the City of Gerald from October 2014 to September 2015. She worked for the police department without incident until she began to speak out on how state grant funds were being used by the department. (Justus Depo., 26:14-19; 28:8-29:18; 33:17-22, ECF Doc. No. 27-7.) Pinnell's concerns arose when she was paid overtime hours for work performed over the July 4th weekend in 2014. The City received a grant from the Missouri Department of Transportation (MODOT) to help pay officers for overtime hours worked during the holiday weekend. Pinnell says that she received this grant money, although she did not work overtime hours that weekend. (Pinnell's Depo., 22:1-24; 30:16-24, ECF Doc. No. 27-4.) Pinnell claims that Chief Goodwin altered her timecard so that it appeared that she worked overtime when in fact she had not. Id. at 87:6-11. Pinnell also claims that the other two persons who received grant money for overtime hours—Chief Goodwin and Officer Brenn Finley—also did not work overtime hours that weekend. Id. at 30:23-24.

In the two weeks after the Fourth of July Weekend, Pinnell began to speak about these concerns to persons inside and outside of the City's police department. Pinnell says she first objected to Chief Goodwin, including when she saw her timecard for that weekend and when she received her paycheck with grant money: "Chief, I said, that's --- that's not right. That's, you know, I didn't work that." (Complaint, ¶ 15, ECF Doc. No. 1; Pinnell Depo. 41:15 – 42:1.) Pinnell says that she next told her husband, former Chief of Police Tommie Lowe and former Lieutenant Chris Flora about her concerns. According to Pinnell, Tommie Lowe advised her on this instance and other occasions how she could go about addressing her concerns. (Pinnell Depo., 147:3 – 148:3; Affidavit of Plaintiff, ¶ 2, ECF Doc. No. 27-18.) Flora, in turn, advised her to speak to Alderwoman Annette Justus because she had helped him when he "was having issues." (Pinnell Depo., 147:7 –11.)

Pinnell says she was motivated to speak out to "make her end right" and because "because Defendant Goodwin misused taxpayer money through the grant" and that "wrong is wrong, and right is right, and there's no in betweens." (Pinnell Depo., 48:19-21; 215:3-9; 251:10-252:3.) In total, Pinnell, Finley, and Goodwin received $400 of grant money, $113.67 of which was paid to Pinnell. (Suggestions in Support of Defendants' Motion for Summary Judgment, ¶ 6, 10, ECF Doc. No. 22, hereinafter Suggestions in Support.) On Lieutenant Flora's advice, Pinnell says

that she first spoke to Alderwoman Justus about her concerns on or around July 31st . (Pinnell Depo. 196:15-21.) Defendant Justus testified that hearing Pinnell's complaint prompted her to say to herself "oh, my gosh, this can't—we can't have this." (Justus Depo., 33:17-34:5.) She said that she "started asking questions," and that she spoke with a Franklin County officer about the issue. Id.

Through her conversations with Justus, Pinnell decided to repay the grant money she received by working six hours without pay. She documented this agreement by writing a letter that Justus signed, on August 6th, 2015. (Justus Depo. 46:7 – 47:2, ECF Doc. No. 23-4.) The letter explained

> I Angie Pinnell received four grant hours over the July 4th weekend which I never worked. I was scheduled that weekend to work nights. Chief informed me he added hours to my time card along with his own and [Officer Finley's] for overtime grant hours, which no grant hours was [sic] worked. In order for me to have a clear conscious [sic] I donated my firearms training and meeting hours for a total of six hours on August 4, 2015.

(ECF Doc. No. 27-7.) Justus placed that letter in Pinnell's personnel file. (Justus Depo. 52:24 – 53:1.)

After repaying the police department in this way, Pinnell continued to speak about the grant money. From August 1 through September 10, Pinnell says that she spoke with at least eleven additional persons about the grant money. These persons

include then-Mayor Keith Wehmeyer, former mayor Otis Schulte, new Lieutenant Victor Brinkman, Franklin County Deputy Sheriff James Harden,[1] Franklin County Sheriff's Lieutenant Steve Pelton, and Tommie Lowe's wife, Jenny. Pinnell says she also spoke with residents of the area that she "knew from patrolling the town," including Michael Dean, Brad Landwehr, Roger Nelson, a resident of North Bernhardt Avenue, and a resident of Peartree Trailer Court. (Affidavit of Plaintiff, ¶ 2-6, ECF Doc. No. 27-18.) In defendant Justus's words, Pinnell told "everybody" and "anybody who would listen" about her complaints: "Roger Nelson, the people over at the service station," the "people at the store I work at…the J and L over here." (Justus Depo. 124:24-125:16; 231:3-9.)

During this time, August 1 to September 10, the City and its police department held three meetings to discuss personnel issues, including Pinnell's complaints. The first meeting was held on August 4th by the police department, with alderwoman Justus present. (Pinnell Depo. 51:19-21; 63:2-23.) Chief Goodwin testified that this meeting was originally scheduled so that officers could meet the new Lieutenant Brinkman. (Goodwin Depo., 43:10-21; 31:11-33:7, ECF Doc. No. 27-5.) After talking with Alderwoman Justus, however, Goodwin decided to discuss "chain of command" issues at the meeting as well. Id. at 43:10-21. At the meeting, Goodwin allegedly told his officers that "the next officer that goes

---

[1] James Harden is also Pinnell's boyfriend's brother.

over the top of my head will be wrote up and/or terminated." (Goodwin Unemployment Hearing Depo., 17:17 – 18:2, ECF Doc. No. 27-28.) Justus testified that, when making this statement, Goodwin was referring to Pinnell. (Justus Depos., 87:4-88:7.), while officer Finley testified that the meeting itself was about Pinnell. (Finley Depo., 32:14-33:8, ECF Doc. No. 27-19.)

One week later, on August 11th, the board of aldermen held a special executive council meeting with Pinnell. (Special/Executive Council Minutes, ECF Doc. No. 27-9.) Other meeting attendees included Chief Goodwin, Lieutenant Brinkman, Mayor Wehmeyer, City Clerk Jane Hungler, Alderpersons Hillary Ward, Jason Risse, Stephen Grgurich, and Justus and officers Finley, Flora, and Chris Sparks. Id. Justus testified that she called the August 11th Meeting for several reasons, "but mostly because [of] how [Pinnell] felt about going to firearms training." (Justus Depo., 108:6 – 111:25.) On August 3rd, Pinnell told Justus about a conversation she had with her boyfriend's brother, Franklin County Deputy Sheriff James Harden. (Justus Depo., 54:12-22.) According to Pinnell, when she told Harden about her concerns with the grant money, Harden said that she should be careful: sometimes "accidents happen, especially with allegations out there like [Pinnell] had made against the chief." (Exhibit 4, Plaintiff's Depo., 203:21-204:13.)

Justus said she also called the August 11 meeting because of poor communication among staff and complaints that some officers had against Pinnell. (Justus Depo., 108:6 – 111:25.) Justus testified that she wanted the meeting "to be about everybody … where everybody voiced what they felt." Id. at 108:6 – 111:25; 162:15-19. At the meeting, officers spoke about "time off requested, safety and harassment." (Executive Council Minutes, p. 3, ECF Doc. No. 23-8.) Pinnell says she discussed her grant money concerns, stating that Chief Goodwin, himself, should not have been paid grant money because he was on a salary. (Pinnell Depo., 201:11-16.) According to Pinnell, after she discussed her concerns about the grant money issue, the "meeting moved away from the grant money and the officers began discussing the assignments of the cars." (Suggestions in Support, ¶ 120, ECF Doc. No. 22.)

Pinnell claims that the police department retaliated against her in three ways. She was assigned an older police car on July 31, 2015. (Pinnell Depo. 149:20 – 150:24.) She received her very first disciplinary write-up on August 19, 2015. Id. She claims that she was fired in retaliation for her complaints on September 10, 2015. Pinnell also claims that Lieutenant Brinkman launched an internal affairs investigation into her without her knowledge and without speaking to her. (Plaintiff's Statement of Controverted Material Facts, ¶ 199, Doc. No. 27.) She says that Goodwin brought several disciplinary write-ups against her to the

September 10 meeting, only one of which she was aware of at the time. Id. at ¶ 195. On August 29, Pinnell received a disciplinary write-up for failing to complete the vehicle cover sheet in a report she prepared about a burglary and attempted rape. (Pinnell Depo. 100:1-24.)

On September 10, the board of alderpersons voted to terminate Pinnell if she did not resign. No explicit reason for Pinnell's termination was provided in her termination letter. (Plaintiff's Statement of Controverted Material Facts, ¶ 219.) In their separate testimony, the alderpersons provided varying reasons for the voting to terminate Pinnell. (Suggestions in Support ¶¶, 69-97.) Alderman Grgurich, for example, testified that he voted to terminate Pinnell because of several incidents, including "a dead cat incident, reports of her sleeping on duty, filing poor paperwork, putting the City's Crown Victoria in a ditch on a snowy day, and 'confiscation of private property without due process.'" (Suggestions in Support, ¶ 75.)

The alderpersons generally deny that they decided to terminate Pinnell before the meeting was held. (Suggestions in Support ¶¶, 69-97.) Several of them also deny having conferred with each other about Pinnell, or having knowledge of her grant money complaints before the September 10 meeting. (Suggestions in Support ¶¶, 74, 76, 79, 80.) Pinnell disputes these statements, pointing to separate testimony made by the alderpersons indicating that they had discussed her and

were aware of the grant overtime issue before the meeting. (Plaintiff's Memorandum in Opposition, p. 19, ECF Doc. No. 25.)

Pinnell says that she continued to talk about the grant money after she was fired, including to state officials. Pinnell testified that in late August or early September, she spoke with Franklin County Sherriff, Steve Pelton. (Pinnell Depo., 148:25-150:1.) She says she sought his advice on the grant money issue. Id. at 151:21-152:1. On his advice, Pinnell then contacted the Missouri Department of Public Safety. Id. at 152:4-19. She says she spoke to a Public Safety employee, Ed Chandler, before she was terminated. Id. at 255:4-22. On September 15th, after she was terminated, she had a telephone interview with the Missouri Department of Transportation's (MODOT) Division of Traffic Safety about the grant money issue. Id. at 152:4-19. As a result of Pinnell's inquiries, MODOT conducted an audit on the grant money received by the City. (MODOT Letter to Mayor Ward, December 30, 2016, ECF Doc. No. 27-1.) Based on the audit, MODOT required the City to return the entire grant allocation in a letter dated December 30, 2016. Id. The City later suspended Chief Goodwin and provided notice of its intent to remove him from office in part because of the grant money issue. ("Police Chief Resigns," GASCONADE COUNTY REPUBLICAN, Sep. 20, 2017 at 4:00 pm, ECF Doc. No. 27-27.) Goodwin resigned in September 2017 before a hearing was held. Id.

Pinnell filed this complaint in federal district court on May 18th, 2016. She seeks lost wages and other employment benefits, damages for emotional pain and suffering, punitive damages, costs, and attorneys' fees. The City and its current and former officers (Steve Goodwin, Stephen Grgurich, Ruth Haase, Annette Justus, Jason Risse, Hillary Ward, Keith Wehmeyer, Tom Wright) move for summary judgment against Pinnell. (ECF Doc. No. 21.) They argue that (1) her complaints about the grant money are not protected speech, (2) her complaints were not a substantial motive in her firing, and (3) they did not reach an agreement to deprive her of her constitutional rights.

## LEGAL STANDARD

I can only grant summary judgment if the evidence, viewed in the light most favorable to the nonmoving party, demonstrates (1) that there is no genuine issue as to any material fact and (2) that the moving party is entitled to judgment as a matter of law. Lynn v. Deaconess Med. Ctr., 160 F.3d 484, 486 (8th Cir. 1998) (citing Fed. R. Civ. P. 56(c)). In this evaluation, I view all facts and factual inferences in the light most favorable to the nonmoving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The party seeking summary judgment bears the burden of establishing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Once the moving party has met this burden, the nonmoving

party may not rest on the allegations in its pleadings, but by affidavit or other evidence, must set forth specific facts showing that a genuine issue of material fact exists. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c)(1), (e).

In deciding summary judgment, it is not my role "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Rynders v. Williams</u>, 650 F.3d 1188, 1195 (8th Cir. 2011). Whether a plaintiff's speech is protected by the First Amendment is a question of law that I can decide on a motion for summary judgment. <u>See</u> <u>Altonen v. City of Minneapolis</u>, 487 F.3d 554, 559 (8th Cir. 2007). In contrast, I cannot remove issues of credibility from the jury. When a non-moving party will prevail if believed by the jury, then summary judgment is inappropriate. <u>Kukla v. Hulm</u>, 310 F.3d 1046, 1050 (8th Cir. 2002).

## ANALYSIS

To establish a prima facie case of First Amendment retaliation, Pinnell must allege and prove that (1) she spoke as a citizen on a matter of public concern, (2) the City "took an adverse employment action against her," such as her termination, and (3) her protected speech "was a substantial or motivating factor" in the City's decision to terminate her. <u>Wilson v. Miller</u>, 821 F.3d 963, 967-68 (8th Cir. 2016) (citing <u>Mt. Healthy City Sch. Dist. v. Doyle</u>, 429 U.S. 274, 287, (1977)). Pinnell

"bears the burden of demonstrating that her speech is protected." <u>Altonen v. City of Minneapolis</u>, 487 F.3d 554, 559 (8th Cir. 2007). If Pinnell shows that she spoke as a citizen on a matter of public concern, her claim may still fail if her First Amendment interest does not "outweigh the City's interest in maintaining the efficient operation of its enterprise." <u>See</u> <u>Kincade v. City of Blue Springs</u>, 64 F.3d 389, 395 (8th Cir.1995); <u>Pickering v. Bd. of Educ.</u>, 391 U.S. 563 (1968). This step is known as the <u>Pickering</u> balancing test, and I apply it before considering items (2) and (3) above concerning adverse employment actions.

The <u>Pickering</u> balancing test is only applicable if the defendant establishes that the speech in question created a disruption in the workplace. <u>Sexton v. Martin</u>, 210 F.3d 905, 911 (8th Cir. 2000). "The City bears the burden under the <u>Pickering</u> balancing test of establishing permissible grounds" for employees' discharge. <u>Kincade v. City of Blue Springs</u>, 64 F.3d 389, 397. "Mere allegations of disruption are insufficient to put the <u>Pickering</u> balance at issue." Sexton v. Martin, 210 F.3d 905, 912 (8th Cir. 2000). "To trigger the <u>Pickering</u> balancing test a public employer must, <u>with specificity</u>, demonstrate <u>the speech at issue</u> created workplace disharmony, impeded the plaintiff's performance or impaired working relationships." <u>Lindsey v. City of Orrick, Missouri</u>, 491 F.3d 892, 900 (8th Cir. 2007) (emphasis added).

I find that, the <u>Pickering</u> balancing test is not triggered in this case: the defendants admit that any workplace disharmony was not caused by Pinnell's allegedly protected speech. In defendants words, "[i]t was Pinnell's overall attitude and capabilities as an officer—not her allegedly protected speech—that had an adverse impact on the harmony, efficiency, and working relationship of the Gerald Police Department, and consequently, on her employment." (Defendants' Supplemental Suggestions, p. 7, ECF Doc. No. 45.) Accordingly, defendants concede that they cannot trigger the <u>Pickering</u> balancing test. They argue instead that the police department was disrupted, and Pinnell was fired, because of her "overall attitude and capabilities." <u>Id.</u> Because defendants concede that the speech at issue did not cause workplace disharmony, they do not meet their burden to trigger the <u>Pickering</u> balancing test. <u>See</u> <u>Lindsey v. City of Orrick, Missouri</u>, 491 F.3d 892, 900.

The defendants otherwise offer three items of evidence to argue that Pinnell contributed to disharmony in the City of Gerald. Defendant Justus, for one, testified that other City of Gerald police officers were "tired of [Pinnell] complaining." (Justus Depo., 91:2 – 2:13, ECF Doc. No. 23-4.) The complaints at issue appear to concern Pinnell's assignment to an older car, an incident with a dog, and issues concerning personal time. <u>Id.</u> at 108:10-109:5. Defendant Goodwin testified that he fired Pinnell because she was planning to "make a scene" at the

September 10 board meeting. (Goodwin Depo. 147:15 – 148:18, ECF Doc. No. 23-5.) Goodwin also testified that "[Lieutenant] Vic[tor Brinkman] was having problems with [Pinnell]," specifically because she complained about the older car. Id. at 27:11-27:21.

If there was any doubt about defendants' admission, this evidence fails to otherwise trigger the Pickering balancing test. Each of these items either (1) do not concern Pinnell's protected speech or (2) pertain to disruption in the board meeting rather than Pinnell's working environment. Accordingly, I will not conduct a Pickering balancing concerning the facts of this case. The defendants do, however, dispute that Pinnell engaged in protected speech and that any protected speech was a "substantial factor," in their decision to terminate Pinnell. Accordingly, I examine these arguments in more detail.

## I. First Amendment Retaliation

### A. Protected Speech

The First Amendment protects speech made by a private citizen about a matter of public concern. See Pickering v. Board of Education, 391 U.S. 563, 568 (1968). The "private citizen" aspect of this doctrine does not exclude public employees from this test. See id. Even statements by pubic officials "directed at their nominal superiors" are protected by the First Amendment when those

statements are "on matters of public concern." Id. As a result, the "public concern" aspect of this doctrine is often dispositive.

Whether a public employee's speech "addresses a matter of public concern" is determined by "the content, form, and context of a given statement, as revealed by the whole record." Connick v. Myers, 461 U.S. 138, 147-48 (1983). Heightened public interest in the issue is not dispositive on its own. See Domina v. Van Pelt, 235 F.3d 1091, 1098 (8th Cir. 2000). Instead, courts have considered such factors as (1) to whom the public employee spoke to, see Connick, 461 U.S. 138, 148, (2) whether the statement was made pursuant to the employee's duties or up the chain of command, see Davis v. McKinney, 518 F.3d 304, 313 (5th Cir. 2008), and (3) whether private interests have motivated the speaker, see Anzalduaa v. Northeast Ambulance and Fire Protection Dist., 793 F.3d 822, 833 (8th Cir. 2015). When applying this test, courts may find that a public employee's speech relates both to her private interests and matters of public concern. In such circumstances, "the speech is protected if it is primarily motivated by public concern." Id. at 833; McCullough v. Univ. of Ark.for Medical Sciences, 559 F.3d. 855, 860, 866 (8th Cir. 2009).

In support of their motion for summary judgment, the defendants argue that Pinnell's complaints about grant money were primarily motivated by her private interests. They claim that Pinnell was motivated to (1) "balance the books" by

working six hours for free and therefore "make [her] end right" and (2) protect herself from potential retaliation. (Suggestions in Support, p. 44, ECF Doc. No. 22.) They also claim that Pinnell fails to provide any evidence that she tried to inform the public as a citizen prior to her termination. According to defendants, Pinnell only identified two people she discussed the grant money issue with before her termination "who were not either an employer or another acquaintance in law enforcement." Id. at 42.

These arguments fail to overcome Pinnell's evidence that she spoke primarily out of public concern. First, Pinnell demonstrates that she continued to speak out about the grant money, even after she repaid the police department by working six hours unpaid. Pinnell logged those hours on August 4th and reached an agreement with Justus on August 6th, whereby she donated six hours as reimbursement for the grant money. (Justus Depo. 46:7 – 47:2, ECF Doc. No. 23-4.) It is unclear how many of Pinnell's conversations occurred between August 6th and September 10th, because exact dates are unknown for many of her conversations. According to Pinnell, however, she spoke with at least twelve persons about the grant money between August 1 and September 10. (See, e.g., Plaintiff's Statement of Controverted Material Facts, ¶¶ 146-159.) Pinnell also testified that she spoke with Franklin County Sherriff Steve Pelton, in late August or early September, several weeks after she had paid back her hours. (Pinnell

Depo., 148:25-150:1.) Through this evidence, Pinnell demonstrates that her conversations, especially those after August 6th, were motivated by something other than her private interest in repaying grant money that was wrongly given to her.

Pinnell's public concern is further evidenced by the broad range of persons she spoke to both inside and outside of City government. Of the twelve persons that Pinnell says she first spoke to between August 1 and September 10, ten were not affiliated with City government at the time, and five had no apparent past or present employment relationship with City government. These five persons include Jenny Lowe, Michael Dean, Roger Nelson, a female North Bernhardt resident, and a male Peartree Trailer Court resident. (See Affidavit of Plaintiff, ¶ 2-6, ECF Doc. No. 27-18.) Pinnell claims that she knew five of these persons "from patrolling the town." Id. Pinnell also spoke with past city officials and current county officials about the issue, including former mayor Otis Schulte, Deputy Sheriff of Franklin County James Harden, Franklin County Sheriff Lieutenant Steve Pelton. (Plaintiff's Statement of Controverted material Facts, ¶¶ 149-152.)

Pinnell provides evidence that her motivation in speaking to these persons, and to her co-workers, was to highlight wrongs that were being perpetrated against taxpayers. According to Pinnell, she told several persons outside of the City government that "it was unfair for the Chief to do this with taxpayers' money."

(Affidavit of Plaintiff, ¶ 4, ECF Doc. No. 27-18.) She says she noted that the Chief took grant money for overtime pay and distributed some of the grant money to himself, although he was a salaried employee not entitled to overtime. Id.

Accordingly, the content, form, and context of Pinnell's conversations indicates that she spoke primarily out of public concern in several circumstances. Pinnell presents evidence that her conversations with Otis Schulte, Jenny Lowe, Michael Dean, Brad Landwehr, a resident of Main Street, a resident of North Bernhardt Avenue, and a resident of Peartree Trailer Court were made primarily out of public concern. See id. ¶¶ 2-6. According to Pinnell, the content of those conversations included her concerns that "what the Chief did was wrong and unfair to taxpayers, like them." Id. at ¶ 4. The form of those conversations was face-to-face communication outside of any chain of command. Finally, the context of those conversations included Pinnell's habit of telling "everybody" and "anybody who would listen" about her complaints. (Justus Depo. 124:24-125:16.) Word was getting out that Pinnell had ethical concerns about grant money use.[2]

Pinnell's earlier conversations—including her initial conversations with Tommie Lowe, her husband, and Justus—appear more focused on her private interests in behaving ethically and protecting herself from retaliation. Pinnell's

---

[2] See Plaintiff's Statement of Controverted Material Facts, ¶ 204 (alleging that officer Jason Spark's wife wrote a letter concerning conversations she had with Jenny Lowe and Otis Schulte about the grant money); Id. at 191 (On or about August 19, Lieutenant Brinkman informed Goodwin that Pinnell had talked to Deputy Harden about the grant issue.).

motivations appear to have shifted over time, however, such that her speech in August and September 2015 was primarily motived by public concerns. As a result, I find that Pinnell's speech is protected.

## B. Motivating Factor in Termination

Finally, I must determine whether there is a genuine issue of material fact as to whether Pennell's protected speech was a motiving factor in the City's decision to fire her. See Wilson v. Miller, 821 F.3d 963, 967-68; Minten v. Webber, 832 F.Supp.2d 1007, 1024 (N.D. Iowa 2011). This inquiry is essentially an issue of causation. See Revels v. Vincenz, 382 F.3d 870, 876 (8th Cir. 2004). "Retaliation need not have been the sole motive, but it must have been a 'substantial factor' in those decisions." Kilpatrick v. King, 499 F.3d 759, 767 (8th Cir. 2007) (citing Wishnatsky v. Rovner, 433 F.3d 608, 613 (8th Cir.2006)). Pinnell may prove such a motive by "circumstantial evidence giving rise to an inference of retaliatory intent." Williams v. City of Carl Junction, Mo., 523 F.3d 841, 843 (8th Cir. 2008) (citations omitted). "The causal connection is generally a jury question, but it can provide a basis for summary judgment when the question is so free from doubt as to justify taking it from the jury." Revels, 382 F.3d 870, 876.

I find that the cause of Pinnell's firing is not "so free from doubt as to justify taking it from the jury." As a result, the defendants' argument fails. Pinnell provides evidence of retaliatory intent through defendants' testimony. Alderman

Grugrich testified that he wanted to terminate Pinnell because of her "breach of confidentiality… representing the law enforcement to the face of the public." (Grugrich Depo., 81:11-20.) Alderwoman Justus testified that she supported terminating Pinnell because of Pinnell's "talking outside of the office, the nitpicking, the complaining." (Justus Depo., 175:4-9.) Similarly, Lieutenant Brinkman testified that Pinnell was terminated for "jumping the chain of command… more than once." (Brinkman Depo., 223:15-20). Pinnell also testified that Goodwin told her on September 12, 2015, that the board terminated her "because [she] went above his head about the – going to Annette Justus about the grant money." (Pinnell Depo., 163:22-164:1.) These are not the only reasons that Defendants offered for terminating Pinnell. (See Suggestions in Support ¶¶, 69-97.) It is clear, however, that Pinnell has offered sufficient evidence to create a dispute of material fact as to whether her protected speech was a motiving factor in her termination.

## II.      Conspiracy to Violate First Amendment Rights

To prevail on summary judgment for her 42 U.S.C. § 1983 conspiracy claim, Pinnell must present evidence (1) that the defendants conspired to deprive her of constitutional rights, "(2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy," and (3) that the "overt act" deprived Pinnell of a constitutional right or privilege. Bonenberger v. St. Louis Metro.

Police Dep't, 810 F.3d 1103, 1109 (8th Cir. 2016). In meeting this standard, Pinnell must "point[] to at least some facts which would suggest [the defendants] reached an understanding to violate her rights." City of Omaha Emps. Betterment Ass'n v. City of Omaha, 883 F.2d 650, 652 (8th Cir.1989). If Pinnell has offered enough evidence to create a possibility that a jury could infer "a meeting of the minds," then I cannot take the conspiracy question from the jury. Bonenberger, 810 F.3d 1103, 1109.

Defendants argue that I should grant summary judgment on Pinnell's conspiracy claim for three reasons. First, they argue that Pinnell has failed to prove a deprivation of her constitutional right in the underlying claim. Because I reject defendants' arguments for summary judgment on the underlying claim, I reject this first argument against the conspiracy claim as well. Second, defendants argue that the City of Gerald cannot conspire with itself under the intracorporate conspiracy doctrine. L.L. Nelson Enterprises, Inc. v. Cty. of St. Louis, Mo., 673 F.3d 799, 812 (8th Cir. 2012). Third, they argue that Pinnell cannot point to facts suggesting that the defendants reached an understanding or agreement.

Under the intracorporate conspiracy doctrine, "a local government entity cannot conspire with itself through its agents acting within the scope of their employment." Id. This doctrine applies in circumstances where "the challenged conduct is essentially a single act of discrimination by a single business entity."

Cross v. Gen. Motors Corp., 721 F.2d 1152, 1156 (8th Cir. 1983). In this case, Pinnell alleges that the defendants took actions that were outside the scope of their employment. She claims that the defendants acted to "protect themselves from the consequences of their own misconduct." (Complaint, ¶ 43.) She also alleges more than a single act of discrimination. Beyond her termination, Pinnell alleges that the defendants "prevent[ed City] officers from speaking about matters of public concern," provided discipline "in retaliation for Pinnell's exercise of free speech rights," and engaged in a pattern of conduct "to protect themselves from the consequences of their own misconduct." Id. For these reasons, Pinnell's claims fall outside of the intracorporate conspiracy doctrine.

Thirdly, I find that Pinnell points to facts suggesting that the defendants reached an understanding or agreement to deprive her of her constitutional rights. See City of Omaha Emps. Betterment Ass'n v. City of Omaha, 883 F.2d 650. In her complaint, Pinnell alleges that the defendants formed a mutual understanding "to protect Goodwin and shield the police department/City from public scrutiny by firing Pinnell because of her constitutionally protected speech." (Complaint, ¶ 43, ECF Doc. No. 1.) She also alleges that the defendants committed the following overt acts in furtherance of this conspiracy: (1) firing Pinnell, (2) preventing police officers from speaking about matters of public concern through Goodwin's orders,

and (3) disciplining Pinnell in retaliation for her exercise of free speech and as a pretextual reason for her illegal termination. Id.

Defendants argue Pinnell has conceded any claim that they reached an agreement among themselves. In her testimony, Pinnell said that "I don't believe anybody else is involved other than himself [Chief Goodwin] trying to cover up his own actions." (Pinnell Depo. Vol. I, 172:11-20). In the same exchange, however, Pinnell testified that she believed that Goodwin "used the lieutenant to help carry out those actions." Id. In her memorandum in opposition, Pinnell also points to a "back room" meeting in which the alderpersons discussed firing her. (Plaintiff's Memorandum in Opposition, p. 19, ECF Doc. No. 25.) At that meeting, Goodwin allegedly asked if he should fire Pinnell, and Grgurich allegedly said that the board should fire Pinnell. (Justus Dep. 170:5-171:13.) According to Justus, the alderpersons responded "no, not at this time." Id. at 170:3. She says the alderpersons said "oh, wait, just a minute." Id. at 170:24-25. Pinnell further points to conversations between Brinkman and Goodwin, where they discussed Pinnell's speech with Franklin County Sheriff's deputy Harden. (Plaintiff's Statement of Controverted Material Facts, ¶¶ 191-192.) About two weeks later, Pinnell received her first disciplinary write-up. Id. at ¶ 193.

Pinnell argues that this first write-up and other write-ups she received around that time were allegedly used as a pretext to fire her. (Complaint, ¶ 43.)

Pinnell supports this theory by claiming that the board of alderpersons' was uninterested in the reason for her firing. Id. at ¶ 197 ("The Board did not read the write-ups on Plaintiff, did no independent investigation into any of the allegations, and do not know for a fact whether or not the allegations were true."). Justus, for example, testified that she did not care about the particular reason why Pinnell was being fired. (Justus Depo., 175:1-6.) "All I knew is that we were all done with her." Id. at 5-6.

These statements together provide circumstantial evidence of an agreement among defendants to deprive Pinnell of her constitutional rights. Specifically, Pinnell presents circumstantial evidence that, in executive sessions, the alderpersons reached a mutual understanding with Goodwin and Brinkman to use disciplinary write-ups as a pretext for terminating Pinnell. I do not make any conclusions about the credibility or weight of this evidence to be presented at trial. I do find that "there is a possibility the jury could infer from the circumstances a 'meeting of the minds' or understanding among the conspirators to achieve the conspiracy's aims." White v. McKinley, 519 F.3d 806, 816 (8th Cir. 2008) (citing Larson by Larson v. Miller, 76 F.3d 1446, 1458 (8th Cir. 1996)). As a result, I find that Pinnell has created a dispute of material fact which prevents me from ordering summary judgment on her conspiracy claims.

# CONCLUSION

After carefully reviewing the arguments and factual record, I find that Pinnell's speech was protected because in several instances she spoke as a citizen on a matter of public concern. Pinnell had several conversations in August and September of 2015 that were primarily motivated by her public concerns about the City's use of grant money. I also find that Pinnell has presented evidence sufficient to argue that the City had a retaliatory motive in firing her and that its officers reached an agreement to deprive her of her First Amendment Rights. As a result, I will deny defendants' motion for summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that defendants' Motion for Summary Judgment [Doc. No. 21] is **DENIED**.

**IT IS FURTHER ORERED** that this matter is set for a **status and scheduling conference** on **Friday, April 13, 2018 at 9:30 a.m.** in my chambers.

RODNEY W. SIPPEL
UNITED STATES DISTRICT JUDGE

Dated this 21st day of March, 2018.